The first case on our call this morning is agenda number 12, number 130775, the village of Lincolnshire v. Daniel Olvera. Counsel for the appellant, J.C. Good morning, your honors. My name is Anne Fick. I'm from the Office of the State Appellate Defender, and I represent the defendant, Appellant Daniel Olvera. My name is Anne And there was, was there any evidence about levels of THC necessary to render somebody impaired after a minimum of 12 hours? Nothing. There was no evidence to that. It was based merely on the, the dean's kind of feeling and, you know, having had previous interactions with Daniel. She said she, you know, he's kind of slow. But the video just shows him being a 16-year-old boy walking the halls being maybe a little bit goofy. And as the instructor has testified, well, maybe he was being a little foolish talking to the person in the back seat. But nothing that it would, you know, I'm going to keep him out of the car. So the, the evidence of impairment is extremely slight. And especially given the fact that this was at least, or about 12 hours after he allegedly died. But I don't even know if he smoked at that time or if that's when his mother found out about it or if that's just when he went to sleep. The details aren't specific as to that. And other than her experience as a dean of students, did she have any law enforcement training or roadside, you know, to conduct any, you know, the safety checks or any of the impairment checks that police officers utilize? And even the school resource officer who conducted the on-site sobriety tests admitted he didn't have much experience. So that's why they went back to the police station and a second officer conducted those sobriety tests. And on the video, it's very clear that he did pretty well on those tests. Even though that officer said he was impaired, there was no, no true indication. And the judge even said, well, I think he did pretty well on those tests, but said, well, maybe it's the time that he left between when he left school or when he did the school tests versus the time at the police station. But that was maybe an hour. So it really seems as if that was, you know, the evidence was extremely questionable as to that. Counsel, do we know whether or not the marijuana cigarette that was found on your client that day, do we know whether or not there was any evidence that that had been smoked or consumed? If I recall correctly, my understanding is that there was not evidence that it had been smoked, at least that morning. I believe there may have been conflicting testimonies. Somebody said it was brown. Somebody said it was white. But there was also no evidence that my client even smelled like marijuana or anything like that, or that his eyes were glassy or that, you know, he exhibited some of those other traits. And so your client, though, in his own words, had been up all night long because he was using marijuana the prior evening and then he had cannabis on him. Apparently, I guess, while he was participating in driver's ed. My understanding, yes, that is. I believe he was up all night long because he had been smoking and then his mother caught him and that made him upset and he couldn't go to sleep. And that is sort of what triggered this, you know, him being emotionally distraught. And the officer stopped the testing because your client was unable to maintain his balance, correct? That is what the officer said, yes. I see my time is up. If there are no other questions, we ask this court to reverse the ruling of the second district and find that it was not proven beyond a reasonable doubt that he was found guilty of driving under the influence. Thank you very much. Counsel for the appellate. May I please report, counsel? My name is Lawrence Lawless-Earn from the law firm of Lawless-Earn and Smith in Waukegan, Illinois. I represent the appellate in the village of Lincolnshire. As to the issue that the appellant has raised regarding the letter of authority, I think it's very clear from both the record at the trial and at the appellate court that the defendant has forfeited this issue and they've acknowledged that in their brief before this court and is simply going on the claim hitter doctrine. The appellate court addressed that issue as well, and they said obviously the criteria for establishing error under the plain error doctrine, their first law has to be a clear and obvious error. And then they are proceeding on the second prong in that the error was so serious that it affected the fairness of the defendant's trial and challenging integrity of the judicial process, regardless of the closeness of the evidence. As to whether there was a clear and obvious error, I think the appellate court was correct that there was not. As has been mentioned during counsel's argument there, the statute does not require that the letter of authority from the state attorney's office be filed anywhere. It just means it has to exist. And there's very little case law on this issue as far as being litigated at the trial level. It's always being litigated at the appellate level, and it's usually when somebody other than the trial counsel is appellate counsel. So, Mr. Welleser, could the appellate court have taken judicial notice of the existence of the document? That's a good question because I don't know that it was publicly available, such as on the state attorney's website. Certainly the state's attorney keeps records of all the letters of authority issues to the various municipal attorneys in Lake County. I believe the Lake County clerk of the circuit court has a list of the municipal prosecutors. Now, whether that actually has a copy of the letter of authority or any language in there, it would be clear to anybody in the public if they went to the clerk of the clerk's website, for instance, if they were trying to find out who to send notice to on a prosecution case. If they would be able to find out who the local prosecutor was for that municipality, it would be contact information. So to the extent that it would be out there, it could be taken judicially, so certainly. What about this point that it's just fundamentally unfair that the defendant did not have actual notice of the authority to prosecute Plano Village? Well, I don't want to think it's a fairness issue from the standpoint of this issue is not dispositive of the case. If for some reason the municipal prosecutor did not have a letter of authority from the Lake County state's attorney's office or any state's attorney, that prosecution would be assumed by a state's attorney that originally has the authority to do that. So it's just a matter of who the prosecutor is going to be. It's not going to change the outcome of the process. So if that letter did not exist, that would, you're saying, be second-prong error? No, I don't think it would be because it's not affecting the fairness of it. When you look at the structural errors that the U.S. Supreme Court. But if it did not exist? If it did not exist, it would not be a proper party. But that would not be a basis for vacating the judgment or being a void judgment there. It's just a matter of the process of doing that. So would you say that if we found that it was not something that could be taken judicially and the agreement didn't exist, that in this court would then the remedy be to remand it for another proceeding? I mean, if you had someone without authority? Yeah. I don't think you're going to have jeopardy attached in a situation that the defendant could not be prosecuted again. And it would be remanded and, you know, the proper authority. Or maybe that whole issue would have to be resolved. But they clearly forfeited it by not raising that. And both the appellate court in this case and in the Wade case, and the third district appellate court about two weeks before the argument in this case, also held that this was forfeited if it wasn't raised in there. And so, you know, this case was in court 22 times over about a two-year period before it actually went to trial before Judge Axel, and the issue was never raised. And so to say that there was some unfairness about that, you know, really isn't correct because they could have raised that at any point if there was a question about that. The fact that it was prosecuted by the municipality, did that in any way prevent the defendant from presenting a defense or anything that he wanted to put forward in his defense? No, not at all. In fact, the village of Moyntonshire, through its own ordinance, has adopted the Illinois Vehicle Code by reference, which is permitted. And so the burden of proof, the maximum penalties would be both the same as whether it was charged by the state or by the village of Moyntonshire. And that has been an issue that has been litigated previously, that we have to, if we adopt the Vehicle Code as our traffic code, we have to adopt all the penalties and the burdens of proof. So the defendant would still have all the same rights, that we would have to prove him guilty beyond a reasonable doubt, that he had the right to remain silent. And so whether it was charged as a village case, and his counsel referenced the notation on the ticket, I think how the officer, these are electronic tickets now, but they put the ordinance number and then they put 11-501A4, which is with this particular case, because it was under the influence of drugs. Opposing counsel relies on the Moon case, where there was a finding that a constitutional right to have a jury sworn with a trial, that that was violated and thus improper. How is this case different than that? Well, I think it's significantly different. And when you review the Moon case, this court went on a very detailed history of the purpose of an oath of a jury. You know, historically, going back, you know, back before this country even started going back to England. And the role of that and the significance of, you know, 12 jurors being sworn, raised their right hand to examine the evidence impartially, and the importance of an oath to add a more level of seriousness to it, if you will, of their obligation as a juror to sit this fairly and impartially. And again, this court went on many, many pages, going through the historic context of it, the case law in this. And there's simply not that legislative history or case law history in this case. It's not a fairness issue. In fact, in the third district, in the case that we cited, the votes of Gwen Ellen v. Podgool, the appellate court in that case talked about, the defendant just said, I'm not prosecuted by the right person. I'm not saying I was treated unfairly. I'm not saying I was denied my right to counsel. I was not denied my right to cross-examination. I was not denied my right to be proven guilty beyond a reasonable doubt. So none of the defendant's rights in that trial, as in this case, were in any way affected by who was prosecuting that case. And I don't think it raises to the same level of the oath of a jury and what that poses, because in the Moot case, what they indicated is the defense counsel would not be in a position to strategically allow that oath to just kind of slip by, because it would be a void of judgment. Jeopardy would not have attached, and that would not preclude his client from being retried. So there was no strategic advantage in doing that. And so I don't think it comes close to what Moot said as far as the seriousness of the oath for a jury. So, again, I believe that issue has been forfeited, and I think that the basis to reverse the court based on that should be affirmed. Now, as to the proof beyond a reasonable doubt issue, I think it was brought up about, I think counsel too narrowly limits the issue of the proof beyond a reasonable doubt to Scott Peckler's testimony, the driving instructor, and indicating that that's the only evidence, at least from their argument, that the defendant could not safely drive the vehicle. And because there's a question about that, they're saying, well, the village hasn't proven beyond a reasonable doubt. And, again, we have to take this in the light most favorable to the prosecution here. I don't think a fair reading of Mr. Peckler's testimony can indicate anything but the defendant was driving poorly. From the moment that he left the school parking lot until he turned onto Half Day Road to begin his road, he immediately drifted into the right lane, and the instructor had to grab the wheel and pull him back in there. He had to use his brake, which the driver's-led vehicles are equipped with, to stop the defendant at certain times because he wasn't coming to a stop sign quickly enough or a stop light quickly enough. There were numerous times when he nearly struck the curb in the traffic circle. But all of that, as you said, he was driving badly. But the statute doesn't say you're driving badly. It says that you're impaired such that you are not driving appropriately or whatever. So his testimony, Peckler says over and over again, if he had any thought that he was impaired, he would have stopped the vehicle immediately. So how, I mean, after the fact, people say, well, that's an indicia of impairment. But the person that is actually in the vehicle with him, also with another person they're in charge of, they're responsible for, he didn't consider that impairment. He was in a unique position being a driver's-led instructor. Obviously, the court has recognized this unique situation of an inexperienced driver to start with here. And that's what the defense relied on, as their defense throughout the trial at the appellate level and here. Now, Mr. Peckler clearly testifies that he's a bad driver. But as the trial court found, his concern increased throughout the course of the driving so much that he actually had the defendant taken back to the classroom and told the instructor, you should have him checked out by the nurse or somebody. He's not right. And I guess if you can put yourself in Mr. Peckler's position, he's a driver's instructor. Now, this was beginning of May. It was almost the end of the semester. And Mr. Peckler testified this was one of the one or two last driving parts of their routine. So this was not the first time this defendant had been in a vehicle. And he's always, as he testified quite candidly, given some deference to the nervousness of the driver, a young driver, because he said he didn't know what their experience was, how much other driving they'd done beyond the classroom and so forth. But as the trial court pointed out, as they kept going along, that concern increased. And when they get back to Riverwoods Road and Route 22, almost on the way back to school, they stop at a red light. And he said the defendant puts his head down, closes his eyes, and nods off. So it was at that point he said, wait a minute, this isn't just nerves. This isn't just somebody that maybe hasn't practiced enough. There's something wrong here. This is 2 o'clock in the afternoon. But he didn't pull him out of the vehicle then, did he? He didn't.  And, you know, but the other thing he did, between having the break and the ability to kind of commandeer the vehicle, unlike a parent who's driving with their child who's learning how to drive, he has some ability to kind of control it. Yeah, he didn't. But I think where things start to change is when he gets back to the school. And Mr. Pepper says, you know, he's just not right. I couldn't put my finger on it. He's not right. And so it was then that the dean takes him down to the nursery and they check him out. They find the marijuana cigarette in his wallet. I believe there was some testimony from at least one of the witnesses that it appeared to have been burnt. The dean, Sarah Rogers, had been his dean for 2 years. She had about 20 to 30 contacts with him. She said, this isn't the way he acts. He was very slow. His speech was slurred. He wasn't reacting to questions. And he admitted to smoking cannabis the night before. Now, as in any case in which you have a defendant, their admissions aren't necessarily taken as the truth. There was no corroboration that he smoked at 3 o'clock, and that was the last time he smoked. But that's what he admitted to the dean. And she noted and testified that he told her he was still feeling the effects of the— He just said, must be. His response to her question was, must be. Yeah, and so he was feeling it. But that was corroborated by her other observations that she made there. And at that point, she's then— she calls Officer Beal, the school resource officer, to investigate the situation, which included having him perform field sobriety tests, of which Dean Rogers was present. And if you recall the record there, the officer took the defendant and the dean over to a— it was a temporary cafeteria area during the COVID crisis in which there was no students around, and they did these tests. And the officer said, I had to stop doing these tests because he was falling over. He had to catch himself. So that's not necessarily nerves at that point. That's not necessarily fatigue. That's impairment. You have an officer who's been doing this for 25 years with those in Lincolnshire and a couple of years with another department before that. He'd been involved in over 100 arrests for DUI and other situations where he observed people under the influence of cannabis. And he said, this guy's under the influence of cannabis. He's not able to do these basic functions. Now, the other thing which the trial court noted in regards to Mr. Pepler's observation, and which was significant in the judge's ruling here, was the Village Exhibit No. 2 was a compilation of the defendant and Mr. Pepler and the other student walking from the classroom through the various hallways of Steveson High School. And this is a fairly large campus. This is 5,000 students. And it took several minutes to walk from the driver's end classroom to the parking lot. And all of this time, the defendant is literally bouncing off the lockers in the hallway but significantly is behind Mr. Pepler. He's not aware of this when they get into the car that the defendant is having difficulty walking a straight line, which is confirmed by the officer after he completed the field sobriety test in the temporary cafeteria. He said, I didn't want to embarrass the defendant because he was going to place him under arrest. We had to walk back through the school to get to my squad car, so I just walked with him. I didn't handcuff him. And he described this as a serpentine manner. He's not able to walk in a straight line. Now, in response to my judge's question about Dean Rogers' experience, she didn't testify about any specific experience, but in response to the trial court's questions about why she thought he was under the influence of cannabis, the judge asked her, could it be that he was tired, that he was nervous? And she says no. The judge gave her two or three opportunities to say it was some other reason other than being under the influence of cannabis, and she said no, he's under the influence of cannabis. And he said, well, what do you base that on? And she said, well, my experience in life, my experience as an educator, and more importantly, her knowledge of this particular defendant. It's not often, and it's often raised by defense attorneys in DUI cases when they're questioning officers, cross-examining them. Well, you've never met this defendant, so you don't know how he acts. You don't know how he speaks. But we have Dean Rogers that's known him for two years. He says, this isn't like him. He is under the influence of cannabis, an opinion which was never objected to by the trial counsel of the defendant. And then you have the officer, Officer Beale, and then Officer Wadey, who also offered the opinion that the defendant is under the influence of cannabis. Again, not objected to. And so you have the driving, which the defendant would have you believe is just due to inexperience. But when you combine that with the other information that the trial court had available to him, the testimony of Dean Rogers, the testimony of Officer Beale, the testimony of Officer Wadey. And let's not forget, when the defendant was asked if he would submit to blood and urine tests at the police department, he refused to do that. Well, why would we do that? Why would he do that? But I think the case law is fairly clear that the court could and did consider that as consciousness of guilt. He didn't want the officers to know exactly when he smoked marijuana, how much marijuana he had. But I think when you consider the light, the evidence of light most favorable to the prosecution, I think the village has properly proven the defendant guilty beyond a reasonable doubt. And I ask you to affirm the trial court and the appellate. Thank you. Thank you. Ms. Lively-Oakland. Thank you. There's a couple of points I'd like to touch upon as far as the reasonable doubt issue. First of all, the fact that Daniel did not submit to the tests was not at all considered by the judge's consciousness of guilt. Daniel admitted he had smoked the night before. The reason that he didn't submit to the testing is because, yes, it would show that he had smoked marijuana at some point before. Additionally, when Daniel was driving, he did put his head down, but there is no evidence that he nodded off or closed his eyes. He just put his head down. He could have been thinking about a hundred different things. Again, he was very nervous. After the nurse examined him, she told the dean he was very nervous, he was very anxious, he was worried. And even in the light most favorable to the prosecution, Daniel was a non-licensed driver who was learning to drive. There was no evidence in the record how much experience he had had. Even if this was at the end of the semester and he theoretically should have gone through several different practice drives, there's no evidence that he was present on those days. There's no evidence as to how much he practiced at home. So there's nothing to base that fact on or to assume that he should have been a better driver than he actually was. And driver's ed cars are equipped with instructor's break because students make mistakes. And this is one of the reasons, you know, he made a lot of mistakes, but again, he was a student learning how to drive. And again, just to point out that impairment is different than the inability or the incapability of driving safely. And that is the narrow issue that is being presented before this court. Can I ask one last question about the first issue? Yes. I've just been thinking this. In your view, what should happen in every case in the municipality? In a case in which they're trying for an Illinois violation of the Illinois vehicle code, the written permission would be filed with the court just like numerous other. In each case. In each case where the village attorney is going to be prosecuting, this is an additional obligation is to file the letter granting authority from the state's attorney for each case. Yes. But this is not an additional. Where are you getting that from? I mean, there's been some discussion about perhaps if it was on each court's website or the state's attorney's website or whatever, that some kind of public notice would suffice. Or are you saying that in every single case that's prosecuted, there needs to be this information? It needs to be on the record. And if I may clarify my earlier answer about judicial discretion, which I believe kind of goes to this, is that if it is shown to the judge, we do have this, but it's not technically filed. If the judge can say on the record this exists, that should suffice because then it is on the record. In each individual case. Yes. So no general announcement, again, website, anything like that. That would not suffice. Currently, my understanding is that these letters are not on any website and there's no way for a defendant to know. Again, I'm asking what you think is necessary under the statute. Unnecessary under the statute. You seem to be saying that every time a village attorney stands before a court in a case like this, filed with the complaint or the ticket or whatever it would be, with that would also be the letter. Yes. If there are no other questions, then we ask that you reverse the second district's ruling here. Thank you very much. This case. Jacket number 12, agenda number 12 letter, number 130775. The village of Lincolnshire versus Daniel Olvera will be taken under advisement. Thank you both for your arguments.